THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HCC CASUALTY INSURANCE SERVICES, INC., | ) ) ) ) |
| *Plaintiff*, | ) ) No.  20 C 7620 |
| v. | ) ) Judge Virginia M. Kendall |
| CHRISTOPHER A. DAY | ) ) ) |
| *Defendant*. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff HCC Casualty Insurance Services, Inc. ("HCC") brings this breach of contract suit against its former president Christopher A. Day, claiming Day violated certain restrictive covenants in his employment agreement and seeking monetary and injunctive relief. Before the Court is Day's motion to dismiss HCC's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Day's motion [12] is granted in part and denied in part.

**BACKGROUND**

The following factual allegations are taken from HCC's Complaint (Dkt. 1) and are assumed true for the purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). HCC is an insurance company that "specializes in writing general liability and excess liability coverages to New York-based commercial and residential contractors." (Dkt. 1 at ¶¶ 10–11). HCC and its affiliates have offices across the United States, Mexico, the United Kingdom, and continental Europe, transact business in approximately 180 countries, and underwrite more than 100 classes of specialty insurance. (*Id.* at ¶ 10).

1

Day served as President and Chief Executive Officer of HCC for approximately nine years. (Dkt. 1 at ¶ 13). As President, "Day was responsible for the overall strategic direction and business approach for the group, as well as supervising its divisions consisting of Primary Casualty, Excess Casualty, and the ArtisanEdge online portal. Day also oversaw the underwriting of project-based construction liability." (*Id.* at ¶ 14). These responsibilities required Day to use and apply HCC's internal data, evaluative tools, and other institutional resources. (*Id.* at ¶ 15–16). Day had extensive knowledge of HCC's "confidential market-specific information, including what parts of the New York construction market have proven profitable" and unprofitable for HCC and "what specific parts of the market [HCC] plans to exit or enter, and why." (*Id.* at ¶ 17). He also had knowledge of and utilized information regarding HCC's customers, brokers, product pricing, finances, employee salaries and bonuses, and hiring and retention strategies, among other sensitive information. (*Id*. at ¶¶ 17–18). HCC alleges it "invested substantial amounts of time and money developing [this] highly confidential business information," which is "the basis for the company's competitive advantage in the marketplace."  (*Id*. at ¶ 12).

To protect its confidential information and competitive advantage, HCC "regularly insists on the inclusive of restrictive covenants in the employee agreements of executives like Day." (*Id*. at ¶ 20). On April 29, 2016, Day executed an employment agreement (the "Agreement") with HCC effective through April 30, 2019. (*Id*. at ¶ 20, Ex. 1-A). The terms of the Agreement were later extended by an amendment through April 30, 2020. (*Id*. at ¶ 26). The present dispute concerns three restrictive covenants in the Agreement: confidentiality, non-competition, and non-solicitation. Under the confidentiality clause, Day may not "reveal or discuss, sell use, lecture upon, publish, or otherwise disclose to any third party any Confidential Information," except as

necessary or with the consent of HCC. (*Id*. at ¶ 20, Ex. 1-A). Confidential information is defined as:

> (a) "Confidential Information" means any information: (1) disclosed to or known by you as a consequence of or through your employment with the Company; (2) not generally known outside the Company; and (3) that relates to any aspect of the Company or its Affiliates or their respective business, finances, operation plans, budgets, research, or strategic development. Confidential Information includes, but is not limited to, the Company's or its Affiliates' trade secrets, proprietary information, financial documents, long range plans, customer lists, underwriting manuals and guidelines, employer compensation, marketing strategy, data bases, costing data, computer software developed by the Company, investments made by the Company, and any information provided to the Company by a third party under restrictions against disclosure or use by the Company or others.

(*Id*. at ¶ 20). Day's non-disclosure obligations "continue in full force and effect after termination of [his] employment and after the termination of th[e] Agreement." (*Id*. at Ex. 1-A).

The Agreement also requires Day to refrain from competing with HCC during and after his employment. (*Id*. at ¶¶ 22–23). Relevant here is the latter, which provides:

> (e) Non-Competition Following Employment. You agree that you will not, at any time during the period of one (1) year after the termination of your employment for any reason, within any of the markets in which the Company has sold products or services, or formulated a plan with your assistance to sell products or services, into a market during the last twelve (12) months of your employ, engage in or contribute your knowledge or Confidential Information to any work which is competitive with or similar to a product, process, apparatus, service, or development on which you worked or with respect to which you had reviewed Confidential Information while employed by the Company. At all times, you shall continue to be obligated under the Confidential Information section of this Agreement not to use or to disclose Confidential Information of the Company so long as it shall not be publicly available.

(*Id*. at ¶ 23).

Finally, Day agreed to a non-solicitation provision as follows:

> (f) Non-Solicitation. You agree that, during the term of your employment with the Company and for a period of twenty-four (24) months from the date of termination of your employment (the "Restricted Period"), you will not, except on behalf of the Company, solicit business, attempt to solicit business, or accept any business from any of the Company's clients or customers, or prospective clients or customers, with whom you dealt,

> solicited, or about whom you reviewed Confidential Information during the last twelve (12) months of your employment with the Company.
>
> You further agree that during the Restricted Period you will not solicit, recruit or hire any person who is, or at any time during the one year period before the date of termination of your employment with the Company was, an employee of the Company, or entice any such employee of the Company to leave the employ of the Company or to violate any agreement with the Company.

(*Id*. at ¶ 24).

On May 2, 2020, two days after the expiration of the Agreement, Day resigned as President of HCC. (*Id*. at ¶ 27). Shortly thereafter, he assumed the same position at Applied Specialty Underwriters ("ASU"), a newly-formed affiliate of Applied Underwriters, Inc. (*Id*. at ¶¶ 1, 27, 29). ASU concentrates on "select Casualty E&S risks across the country, with an initial focus on large construction in New York …." (*Id*. at ¶ 28). HCC claims "Applied Specialty was created as a vehicle for Day to directly compete with" it. (*Id*.) Between September and November 2020, Day hired nine HCC employees at ASU who had previously worked under Day at HCC. (*Id*. at ¶ 30). ASU, under Day's leadership, has also started offering products and services offered by HCC in New York while Day worked at HCC. (*Id*. at ¶ 33). HCC claims this venture "has resulted in the inevitable disclosure and use of" its confidential information because "Day simply cannot serve as the President of a direct competitor without drawing upon and utilizing the Confidential Information he acquired" at HCC. (*Id*. at ¶ 36).

On November 23, 2020, HCC filed suit in the Southern District of Texas claiming Day breached the restrictive covenants in his employment agreement. (*Id*. at ¶¶ 55–65). The case was subsequently transferred to this Court on December 21, 2020. (Dkt. 23). HCC seeks a temporary restraining order, and ultimately a preliminary injunction, against Day's further violation of the Agreement, in addition to monetary damages. (Dkt. 1 at 22–23).

## **LEGAL STANDARD**

When considering a motion to dismiss for failure to state a claim, the Court must construe the complaint "in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the non-moving party's favor." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff need not plead "detailed factual allegations," but the short and plain statement must "give the defendant fair notice of what … the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter that when "accepted as true … 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)).

## **DISCUSSION**

### I. Expiration of Agreement

Day argues that the Agreement and the covenants contained therein expired on April 30, 2020, and thus, at the time he resigned on May 2, 2020, he was an at-will employee not subject to the non-compete and non-solicitation provisions.[1] In support of this position, Day cites to *Marwaha v. Woodridge Clinic, S.C.*, 790 N.E.2d 974 (Ill. App. Ct. 2003).[2] In *Marwaha*, the court examined an employment contract expiring in 1996 containing a two- year non-compete clause beginning "upon termination of the [employee-plaintiff]'s employment…." *Id*. at 976. Plaintiff continued to work for defendant until November 24, 2001. *Id.* Defendant argued that plaintiff's termination in 2001, triggered the noncompete clause. *Id*. The court disagreed concluding that

---

[1] Day concedes that the confidentiality obligations in the Agreement did not expire on April 30, 2020 and continued to be in effect at the time of his departure on May 2, 2020. (Dkt. 1 at Ex. 1-A).

[2] Illinois law governs the Agreement. (Dkt. 1 at Ex. 1-A).

5

"[t]he only reasonable reading of the covenant not to compete is that the language "termination of the [plaintiff]'s employment" referred only to employment under the employment agreement." *Id*. (citing provision in agreement stating "[t]he employment of the [plaintiff] shall be for the period beginning July 1, 1993 and ending June 30, 1996."). The court accordingly held that "the covenant not to compete was triggered only by the termination of the employment under the employment agreement, not by the termination of subsequent [at-will] employment …." *Id*. at 977.

Day maintains *Marwaha* stands for the general proposition that restrictive covenants in expired agreements are unenforceable. Not so. In fact, the *Marwaha* court expressly contemplated that the covenant not to compete began to run in 1996 when the agreement expired and was enforceable for its two-year term through 1998. *Id*. ("[T]he covenant not to compete was triggered only by the termination of the employment under the employment agreement…."); *see also Instant Tech., LLC v. DeFazio*, No. 12 C 491, 2012 WL 2567033, at *5 (N.D. Ill. June 26, 2012) (citing *Marwaha* in support of conclusion that non-solicitation clause began to run on date employment agreement expired). The problem in *Marwaha* was that the employer sought to enforce the two-year non-compete clause to actions occurring more than five years after the expiration of the agreement. *Marwaha*, 790 N.E.2d at 977. Thus, the court was concerned about the unfairness of a non-compete clause in an expired agreement existing in perpetuity. *Id.; see also Virendra S. Bisla, M.D., Ltd. v. Parvaiz*, 884 N.E.2d 790, 795 (Ill. App. Ct. 2008) (employer could not enforce one-year non-compete provision three years after employment contract expired). This concern is not implicated here where HCC asks the Court to apply the restrictive covenants to actions occurring within a year of the expiration of the agreement and within the restricted periods of the covenants themselves. Thus, *Marwaha* does not preclude the enforcement of the present non-compete and non-solicitation clauses to Day's actions following his resignation.

6

As in *Marwaha*, the Court must consider the meaning of the word "employment" as used in the Agreement. If the word is defined coextensively with the term of the Agreement, then *Marwaha* dictates that the covenants, which are triggered upon "termination of [Day's] employment," began running upon the expiration of the Agreement on April 30, 2020. 790 N.E.2d at 977. If, however, the Agreement contemplates employment separate from and beyond the term of the Agreement, the covenants likely remained effective after expiration of the Agreement and were triggered upon Day's resignation from the company on May 2, 2020. *See for example*, *Arthur J. Gallagher & Co. v. Youngdahl*, 412 F. Supp. 2d 1013, 1018 (D. Minn. 2006) (applying Illinois law); *Arthur J. Gallagher & Co. v. Roi*, No. 1–14–0786, 2015 WL 1143167, at *10 (Ill. App. Ct. Mar. 12, 2015). While neither scenario precisely governs the Agreement at hand, the Court concludes that the covenants began to run upon the expiration of the Agreement on April 30, 2020.

When interpreting language in a contract, "a court's principal objective is to give effect to the intent the parties possessed at the time they entered into the agreement." *Regency Commercial Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007). "In the absence of ambiguity, a court must construe a contract according to its own language, not according to the parties' subjective constructions." *William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760, 770 (Ill. App. Ct. 2005). Terms, unless specifically defined, must be given their "common and generally accepted meanings … within the context of the contract as a whole." *Id*. "When parties agree to and insert language into a contract, the presumption is it was done purposefully and the language employed is to be given effect." *Regency*, 869 N.E.2d 310, 316 (2007).

Unlike the contract in *Marwaha*, Day's Agreement does not use the general word "employment" to describe the four-year term of the Agreement. Rather, the Agreement defines the four-year term as the "term of employment" or "Term" and uses the separate phrase "termination

7

of employment" to trigger the running of the non-compete and non-solicitation clauses. (Dkt. 1 at Ex. 1-A); *cf. Marwaha*, 790 N.E.2d at 975 (contract stated "[t]he employment of the [employee] shall be for the period beginning July 1, 1993 and ending June 30, 1996."). The distinction between these phrases as used in the Agreement is best illustrated by the non-solicitation provision which applies both "during the *term of [Day's] employment* with the Company *and* for a period of twenty four (24) months from the date of *termination of [Day's] employment*…" (Dkt. 1 at ¶ 24) (emphasis added). This language evinces an intent by the parties to distinguish between Day's four-year term of employment and overall employment with HCC. *See Youngdahl*, 412 F. Supp. 2d at 1018. The Agreement, however, does not explicitly contemplate continued employment after the "term of employment". *Cf. id.* (in addition to distinguishing between "term of employment" and "termination of employment" subject contract stated "[e]mployment of [employee] shall not necessarily cease as of the expiration of the Term of Employment; however, employment thereafter shall be on an at will basis."); *Roi*, 2015 WL 1143167, at *10 (same). Additionally, the provisions in the Agreement discussing termination of employment generally are nested under the heading "Term of Employment." (Dkt. 1 at Ex. 1-A). Accordingly, the Court concludes that the phrase "termination of employment," is confined by the "term of employment."

Although Day was not technically terminated from his employment during the "term of employment", because the Agreement does not contemplate *any* employment past the term of the Agreement, Day's employment was essentially terminated upon expiration of the Agreement. To conclude otherwise would defy the intent of the parties and allow Day to skirt the provisions of an Agreement he consented to merely because he chose to resign two days after its expiration. The parties expressly contemplated that Day would remain employed through April 30, 2020 and thus, that the restrictive covenants would be in effect one and two years, respectively, from that date.

Day argues the confidentiality provision which states that Day's non-disclosure obligations "shall continue in full force and effect after termination of your employment and after termination of this Agreement" precludes this result. (Dkt. 1 at Ex. 1-A). He argues that had the parties intended the non-solicitation and non-compete clauses to begin running upon termination of the Agreement, they would have specified so as they did in the confidentiality clause. Day assumes that the phrase "termination of this Agreement" refers to the expiration of the term of the Agreement. The Agreement, however, uses the distinct phrase "term of employment" or "Term" to describe the term of the Agreement, indicating that the phrase "termination of this Agreement" means something distinct. It is also significant that the phrase appears only once in the entire Agreement. A more reasonable interpretation of the phrase in the context of this Agreement is that it connotes a time after all contractual obligations that survive the term of the Agreement, such as the non-compete and non-solicitation obligations, have expired. That the phrase is not utilized in the non-compete and non-solicitation clauses supports this interpretation, as those obligations have a clear expiration date while the parties intended the confidentiality obligations to persist perpetually. Thus, the one-year non-compete and two-year non-solicitation provisions began to run on April 30, 2020 and govern Day's conduct after his resignation on May 2, 2020.

## II.  Enforceability of Restrictive Covenants

Day also argues that the restrictive covenants are overbroad and unenforceable as a matter of law. Under Illinois law, covenants not to compete are disfavored and held to a high standard. *See, e.g., Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2007). A restrictive covenant will be enforced if "it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). Illinois courts consider three factors to determine whether a

restrictive covenant contains a reasonable restraint: (1) whether the restraint is greater than required to protect a legitimate business interest of the employer-promisee, (2) whether it imposes an undue hardship on the employee-promisor, and (3) whether it poses an injury to the public. *Id*. The first of these factors is "based on the totality of the facts and circumstances of the individual case," including without limitation "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at 403. Given the fact-intensive nature of this analysis, "unless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1110 (N.D. Ill. 2016) (applying Illinois law). Although an employer faces a heavy burden to ultimately prevail, courts will only find such covenants facially invalid in "extreme cases." *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 21 (Ill. App. Ct. 1993).

### A. Non-Compete

Day argues the non-compete clause is too broad because, if enforced, it would prevent him from working in any capacity, even as a janitor, at a competing business. While courts have struck down non-compete clauses that prohibit an employee from accepting *any* role with a competing business, the clause at issue is more limited in scope. *See for example*, *Medix Staffing Sols., Inc. v. Dumrauf*, No. 17 C 6648, 2018 WL 1859039, at *3 (N.D. Ill. Apr. 17, 2018) (striking down on motion to dismiss non-compete barring employee from "directly or indirectly, own[ing], manag[ing], operat[ing], control[ing], be[ing] employed by, participat[ing] in or be[ing] connected in any manner with the ownership, management, operation or control of," any competitor). Day is prohibited from "engag[ing] in or contribut[ing] [his] knowledge or Confidential Information to any work which is competitive with or similar to a product, process,

apparatus, service, or development on which you worked or with respect to which you had reviewed Confidential Information." (Dkt. 1 at ¶ 23). Under this limitation, Day would not be prohibited from taking a job as a janitor at a competitor because that "work" is not "competitive with or similar to" the work he conducted at HCC. The same logic would allow Day to take on more skilled positions as well. This is sufficient at this stage. Whether this limitation is reasonable and ultimately enforceable, remains to be determined after more facts are developed, particularly regarding the types of work Day performed while at HCC and whether the clause in practice prevents Day from holding a reasonable position at competing businesses.

Day also argues that the covenant is too broad because it does not contain any product limitations. He cites to *AssuredPartners, Inc. v. Schmitt* in which the court, on summary judgment, struck down a non-compete clause that failed to include language prohibiting the employee from engaging in activities "related to the specific kind of professional liability insurance practice he developed during his employment, *i.e.,* LPLI [lawyer's professional liability insurance]." 44 N.E.3d 463, 472 (Ill. App. Ct. 2015). The Court observed: "LPLI entails a specialized area of insurance that does not intersect with every other type of professional liability insurance. Yet [the non-compete] prohibits [the employee] from working with all types of professional liability insurance, not just LPLI." *Id*. Nothing in the record before the court indicated the employee had worked on other types of liability insurance products. *Id*. at 472–73. Unlike the *AssuredPartners* court, this Court does not have the benefit of a developed record. More information must be developed regarding the types of specialty insurance products Day worked on and the extent to which they overlap with other types of specialty insurance products before reasonability can be assessed.

11

Finally, Day argues the non-compete is geographically overbroad. Day is prevented from competing "within any of the markets in which the Company has sold products or services, or formulated a plan with your assistance to sell products or services, into a market during the last twelve (12) months of your employ…" (Dkt. 1 at ¶ 23). While the geographic scope of the non-compete is certainly broad as HCC transacts business in 180 countries (*id*. at ¶ 10), a broad "geographical restriction does not automatically invalidate a postemployment restraint where the geographical prohibition is qualified by an activity restraint*." Maximum Indep. Brokerage, LLC v. Smith*, 218 F. Supp. 3d 630, 637–38 (N.D. Ill. 2016) (citing *Eichmann v. Nat'l Hosp. and Health Care Services, Inc.*, 719 N.E.2d 1141, 1147 (1999)). The Court will give HCC an opportunity to develop the record and establish why its broad geographical restraint is necessary to protect its business interests.

### B. Non-Solicitation

Day argues the non-solicitation covenant is overly broad because it prohibits Day from "solicit[ing], [recruit]ing, or hir[ing]" *any* HCC employee, including presumably janitorial staff. (Dkt. 1 at ¶ 24). Once again, Day cites to summary judgment opinions in which courts have struck down similar clauses. Without a full record, however, the Court is not prepared to conclude that the non-solicitation provision is overbroad. More information must be gleaned, including the number of employees HCC hires and in what capacities. It may be, for example, that HCC does not hire janitors and only employs underwriters. In that case, a non-solicitation clause preventing Day from hiring *any* employee is more reasonable than it would be otherwise.

Day also takes issue with the fact that the provision prevents Day from soliciting former employees. Again, the Court will be better equipped to assess the reasonableness of that

restriction after HCC is given an opportunity to develop the record and explain why and how it protects their business interests.

### C. Confidentiality

Finally, Day argues the confidentiality provision is unenforceable because its definition of confidential information is too broad and because it does not contain geographical or temporal restraints. The Agreement defines confidential information as "any information … that relates to any aspect of the Company or its Affiliates or their respective business, finances, operation plans, budgets research, or strategic development." (Dkt. 1 at ¶ 20).

Such broad prohibitions on the disclosure of information have been repeatedly struck down. In *AssuredPartners*, for example, the court considered a confidential clause prohibiting "the use or disclosure of any 'information, observations and data (including trade secrets) obtained by [employee] during the course of his employment with [employer] concerning the business or affairs of [employer] and their respective Subsidiaries and Affiliates." 44 N.E.3d at 475. Concluding the covenant was "patently overbroad," the court explained that the prohibition on disclosure "would include virtually every fact, plan, proposal, data, and opinion that [the employee] became aware of during the time he was employed … without regard as to whether such information was in any way proprietary or confidential in nature, or whether he in fact obtained the information through a source outside of his work." *Id*. at 475–76; *see also Carlson Grp., Inc. v. Davenport*, No. 16-CV-10520, 2016 WL 7212522, at *3 (N.D. Ill. Dec. 13, 2016) (striking down non-disclosure clause defining confidential information as "all information of or concerning the business of Company" as overbroad); *North American Paper Co. v. Unterberger*, 526 N.E.2d 621 (Ill. App. Ct. 1988) (striking down provision prohibiting disclosure of "any and all items of whatever nature or kind which the Employee has learned of, acquired or obtained

knowledge of, conceived, developed, originated, discovered, invented or otherwise become aware of during the period of his employment" as overbroad). Courts have also observed that broad confidentiality provisions without temporal or geographical limitations are generally unenforceable. *See e.g.*, *Cincinnati Tool Steel Co. v. Breed*, 482 N.E.2d 170, 175 (Ill. App. Ct. 1985); *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *9 (N.D. Ill. Dec. 15, 2014); *Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, at *7 (N.D. Ill. Oct. 20, 2015).

Unlike the non-compete and non-solicitation clauses, the Court cannot conceive of any set of facts under which it would be reasonable for HCC to prevent Day from disclosing "any information … that relates to any aspect" of its business, in any geographical area, for all time. This restriction is patently unreasonable. In his position as President and CEO, Day certainly had access to and gleaned much of HCC's confidential information that is warranted protection, but the non-disclosure clause protects virtually every kind of information Day learned while at HCC even if that information is not truly confidential. It "does not merely restrict the dissemination of confidential information; it drastically limits [Day]'s ability to work in the insurance industry by preventing him from using any knowledge that he gained while in [HCC]'s employ, regardless of whether" its dissemination would actually threaten HCC's business interests. *AssuredPartners*, 44 N.E.3d at 476.

HCC argues the confidentiality clause is not overbroad because it specifies certain types of information that constitute "confidential information," such as trade secrets, proprietary information, financial documents, and customer lists. Certainly, HCC likely has an interest in keeping the enumerated types of information confidential. The clause, however, expressly states that "[c]onfidential [i]nformation includes, *but is not limited to*" these specific categories of

14

information, and thus, does not actually limit the reach of the broad preceding language "any information … that relates to any aspect of" HCC's business. (Dkt. 1 at ¶ 20) (emphasis added); *see Carlson Grp., Inc. v. Davenport*, No. 16-CV-10520, 2016 WL 7212522, at *4 (N.D. Ill. Dec. 13, 2016) ("Although [non-disclosure provision] itemizes particular information in which [the employer] likely has a protectable interest … the broad catch-all language ('of or concerning' [employer]'s business), without further limitation, calls into question its enforceability."). The Agreement's non-disclosure covenant is unenforceable. HCC's claims against Day premised on Day's non-disclosure obligations must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Day's motion to dismiss [12] is granted in part and denied in part. Counts I–III of the complaint are dismissed without prejudice to the extent they are premised on Day's breach of the confidentiality provision in his employment agreement, but are otherwise sustained. HCC may amend its complaint consistent with this opinion within 21 days of the issuance of this opinion.

                                                        _____
                                                        Virginia M. Kendall
                                                        United States District Judge

Date: March 26, 2021